## AMES *vs.* DOWNING.

*In the matter of the Estate of* GEORGE DOWNING, *deceased.*

REASONABLE repairs and improvements, enhancing the value of the property, may be made by an executor, upon leasehold estate, occupied by the legatees or parties in interest jointly, as a residence, and the lease containing a covenant for renewal of the term, and for payment of the value of the improvements to the lessee at the expiration of the demise.

A trustee for sale is absolutely disabled from purchasing the trust property, and the *cestui que trust* may set aside the sale and take back the property.

Where executors, under a power of sale, sold the testator's real estate at public auction, and a third person at the solicitation of one of the executors, and for his benefit, purchased the premises :—Held that the sale, upon an accounting, might be treated as invalid, so far as to hold the executor responsible for the real value of the property at the time of the sale.

A special partnership formed under the provisions of the Revised Statutes, is dissolved by the death of the special partner. It is, like a general partnership, a personal contract, expiring with the death of any of the parties.

The valuation made by the appraisers in the inventory, is not conclusive against the executor or administrator, but may be shown to have been erroneous.

When a surviving partner, who is executor of the deceased partner, has retained the stock of the firm, and traded with it, he is chargeable with the

prices actually realized, or with its fair market value. He cannot charge commissions as surviving partner for collecting the assets of the firm.

JONATHAN MILLER and FRANCIS TILLOU, for Executors.
H. M. DEWEY, for James B. Ames and wife.

THE SURROGATE. This case, though long pending in this Court, presents no complicated questions of fact. The immense amount of testimony taken, and the protracted proceedings before the auditors, were in the main unnecessary; and indeed it is difficult to imagine any reason why an accounting which might have been argued before the Surrogate, at the farthest, in the course of a few weeks, should thus have dragged its slow length along for four years before being brought to argument.

The points of controversy between the parties, are three in number.

1st. Mr. Ames, husband of one of the daughters and legatees of the deceased, objects to certain charges made by the executors for repairs on leasehold premises No. 30 Rutgers Street. After the testator's death, Augustus C. Downing, one of the executors, and brother of Mrs. Ames, who was then unmarried, made an arrangement with Mrs. Sackett, another sister, the substance of which was, that Mrs. Sackett should take No. 30 Rutgers Street, at a certain rent, and her brother and sister should board with her, the rent of the house to be applied in liquidation of their board. Mrs. Ames being then unmarried, this was a wise and prudent plan, to give her the comfort and respectability of a home with her nearest relatives; and I can see no reason why the repairs and improvements of the house during the period of her residence there should not be allowed against the estate. The lease contained a covenant for renewal for a further term of twenty-one years, and also for the payment of the value of the improvements to the lessee at the expiration of the term. The introduction of the Croton water and the construction of the bath-house, con-

stituted substantial improvements, increasing the value of the property, the benefit of which, on the subsequent sale of the lease, accrued to the estate. No remonstrance was made at the time the alterations were going on, by Mrs. Ames, who was then married, or by her husband; and upon the whole, I perceive no solid ground of objection against the allowance of these disbursements.

2d. It is urged that the sale of the lot on Avenue C, in this city, for $2,325, by the executors under the power contained in the will, was void. The property was sold at public auction, and was purchased by Francis Tillou, one of the counsel for the executors on this accounting, under an arrangement with Augustus C. Downing, one of the executors, that he should individually loan him the money to pay for the purchase. The executors accordingly conveyed the lot to Mr. Tillou, who gave a mortgage for the whole amount of the purchase money to Downing, the executor, but in his own individual right. No bond was given, nor did Tillou become in any manner personally responsible for the amount. But on the contrary, an express provision was inserted in the mortgage, that the remedy of the mortgagee in case of non-payment should be confined to the land alone. Downing, as mortgagee, has ever since been in possession of the premises, receiving the rent, paying the taxes, and for insurance and repairs. Tillou bought, at the request of Downing, who owned the adjoining lot, and wished a friend to purchase it, because the line of the lot went through a building standing partly on his own lot, and if a stranger bought it he was apprehensive of trouble. The understanding was, that Downing should receive the rent, pay the taxes and other charges, and apply the balance of the income to keep down the interest on the mortgage. Tillou was to consult him before disposing of the lot. The mortgage was never recorded, nor does it appear that any payments have been made or credited upon it, or any settlement had between the parties. Mr. Ames, the day previous to the sale, inquired the value of the pro-

perty from Downing, who replied that it was worth from $1500 to $1600, but it might bring $1800. To Tillou he stated that he did not think it would sell for more than $1700 or $1800, though he instructed him to buy it, without limiting him as to price. It was purchased for $2,325, Mr. Ames bidding upon it; and I am inclined to think, at that time, it was worth some $3000. A trustee ought not to be permitted to derive the least advantage from the administration of the property committed to his charge. No profit should be made by an executor out of the estate, by its increase or otherwise. (*Lewin on Trustees, p.* 288; 2 *R. S., 3d ed., p.* 156, § 61.) This principle commends itself so well to the conscience, that no legal proposition is more broadly admitted. It is not controverted in this case, its applicability only being denied. How far Mr. Ames was acquainted with the value of the property, I do not know ; it appears he made inquiry of Mr. Downing, whose reply before the sale, placed the premises much below their real value. Mr. Tillou bought at the request of the executor, for his advantage in some measure, and under an arrangement which, to say the least of it, was unusual if not extraordinary. How the purchase money was paid, whether it ever passed, in fact, from the buyer to the seller, or was only managed to be paid constructively by giving a mortgage to Mr. Downing, does not appear, nor do I know that it would be very material. Such a transaction should be judged by its substance, not its form. Nor do I consider it important to determine what actual advantage the executor derived from the sale, but confessedly Tillou purchased at his solicitation, and on his account, notwithstanding the title was taken without any restriction. One thing is plain ; that is, the property has ever since been in the possession and under the control of the trustee. Whatever doubt may once have existed on this point, it is now the universal rule, that however fair the transaction, a *trustee for sale* is absolutely disabled from purchasing the trust property, and the *cestui que trust* is at liberty to set aside the sale

and take back the property. (*Lewin on Trustees*, 376–7–8.) The trustee has, in the present instance, acted through the intervention of a third person, who holds the title, and I cannot pronounce a decree which will affect directly all the parties; but that is no reason why the sale should not, on this accounting, be treated as invalid, so far as to hold the trustee, who has been privy to the sale, responsible. Though there are some unusual circumstances marking the transaction, I am disinclined to make any particular criticism upon them, or to proceed on the ground of undervalue or want of fairness. I put the case simply upon the ingredient of the personal interest of the executor, which, as a trustee for sale, he had no right to allow to enter into the matter. He should have been careful to have kept his own personal interests entirely clear of the sale, and not to have meddled with it any way individually. Upon this dry doctrine without imputing to him fraud in fact, I think the executor ought to be held liable for the value of the property at the time of sale. (*Woodhouse* vs. *Meredith*, 1 *Jac. A. W.* 222; *Whitcomb* vs. *Minchin*, 5 *Mad.*, 91; *Gregory* vs. *Gregory*, *Geo. Cooper*, 204; *Ex parte Hughes*, 6 *Vesey*, 617; *Ex parte Lacey*, *Id.*, 629; *Coles* vs. *Trecothick*, 9 *Vesey*, 248; *Ex parte Bennett*, 10 *Vesey*, 381, 400; 17 *Vesey*, 491, 500; *Davoue* vs. *Fanning*, 2 *Johns. C. R.*, 252; *Hovenden on Fraud*, 1, 474.)

3d. The testator, at the time of his decease, was a special partner of Mr. Hicks, the executor, in business in this city; and the position has been taken by the counsel for the executors, that the firm was not dissolved, but notwithstanding the testator's decease, continued till the expiration of the term limited for its duration. The idea at first impression is apt to win attention if not favor, but on closer scrutiny cannot, I think, be upheld. The legislation which brought into existence among us this form of partnership, had for its main object the encouragement of commerce by permitting the investment of capital in trade, without danger to the public, or risk to the special partner

beyond the extent of the amount invested; and in deter-
mining the legal consequences incidental to the introduc-
tion of such an institution, there seems to me no reason for
departing from the rules of the Common Law, any further
than is fairly and naturally requisite to give full effect to
the intent of the statute; resting upon the presumption
that the Legislature having expressed the points in which
the Common Law was intended to be abrogated, that line
should not by judicial construction be extended, except
by way of reasonable and necessary inference to effectuate
the general objects of the statute. The special partnership
is by no means a complete anomaly. By the statute it is
termed a *partnership*, and both as to the rights of the par-
ties to the contract, and as to the world, it is in itself a pro-
per partnership, except as it limits the liability of the spe-
cial partner, and restricts his control over the business of
the firm. The members are *partners*, and by slight irregu-
larities may easily be turned into general partners. The
statute terms them *partners;* except for the statute they
would be general partners, and from participating in the
profits, it would seem to be a just consequence that they
are partners in every sense, subject to liabilities and enjoy-
ing privileges as partners in every particular, except as
otherwise specially provided. The Common Law regulates
the mutual rights, and duties, and liabilities of partners,
and governs these limited partnerships, in every respect
not excepted out of the general rule by this statute. The
12th Section provides that every alteration which shall be
made in the names of the partners shall be deemed a dis-
solution of the partnership, and the necessary effect of an
assignment by a special partner, of his interest in the firm,
would be to alter the name of the special partner, and thus
to work a dissolution. Such would likewise seem to be the
consequence of the death of the special partner, which
effects an alteration in the name, by operation of law,
through the medium of an administrator. The 18th Sec-
tion declares also, that the general partners shall be liable

to account to each other and to the special partners in law and equity as other partners now are by law; and the 24th Section provides, that no dissolution by the acts of the parties shall take place previous to the time specified for the duration of the partnership, without public notice. There appears to be nothing in the act incongruous with the idea, that the partnership is governed by the rules applicable to general partnerships, except in the particular cases enumerated. There is nothing irreconcilable with the dissolution of the partnership by operation of law in the usual cases. I have looked into the statutes of several of the States, where similar laws have been enacted, and while they all imply that a dissolution may occur by operation of law, those of Massachusetts, Michigan, Rhode Island and Virginia, expressly admit of that mode of dissolution. The Code of Louisiana declares, that all partnerships shall terminate with the death of one of the partners, and quite a number of these acts prescribe, that in cases not provided for, the law relating to general partnerships shall govern. (*Rev. St. Mass.*, 306; *Louisiana Code*, 2799, 2810, 2851; *Rev. St. Maine*, 264; *Laws Mississippi*, 839; *Rev. St. Michig.*, 156; *R. S. N. J.*, 872; *Laws Penn.*, 620; *Laws R. I.*, 282; *Virginia Code*, 583; *Laws Connecticut*, 528; *Laws Indiana*, 429; *Code of Georgia*, 373.) Now if any other principle is admitted, what is the result? If the death of the special partner does not cause a dissolutions, hall that of the general partner have that effect? If the death of the special partner does not disolve the firm, shall his executor or administrator be the partner? If so, does not that introduce a new name into the firm? And if it does, then the executor or administrator becomes a general partner, and if a general partner, then he can dissolve the firm (2 *R. S.*, 3*d ed.*, § 12, *p.* 50), or on the other hand, the estate he represents may be thrown into the hazards of a general partnership, and the executor or administrator have to attend personally to the transaction of a regular partnership business. The above statement of some

of the embarrassing results which would flow from this
novel proposition, should induce hesitation and caution in
admitting it.

No doctrine is more universally established, than that
by the death of any one of the partners the partnership is
*ipso facto* dissolved ; and this not only as to the deceased
partner, but also as between all the survivors, and, how-
ever numerous the association may be.   The reasoning
upon which this result is attained, as well as the rule itself,
is amply illustrated by the Civilians, the doctrine having
its foundation in the Civil Law, though it has been recog-
nized and adopted, to its fullest extent, by the Common
Law.   The personal qualities, skill, character, and credit
of each partner enter so thoroughly into every contract of
this kind, that the law very wisely considers it a personal
contract, expiring with death.   Though these reasons are
not so apposite to a special as to a general copartnership,
yet they are measurably applicable.   It is true that a spe-
cial partner has no control over the business of the firm,
and contributes, as a matter of duty, no portion of his
time, labor, or abilities, towards the management of its
affairs, but he may from time to time examine into the
state and progress of the partnership concerns, and advise
as to their management.   This brings him into the most
intimate relations with the general partner ; and, in view
of his right to give advice, it is evident the general part-
ner may perhaps have built up well-founded hopes of a
successful and thriving trade, upon the experience, wis-
dom, and abilities of his associate, expectations sure to be
destroyed by death.   How often is it the case that a suc-
cessful merchant, retiring from the cares of active business,
enters into a partnership of this kind, where his knowledge
and sagacity, and his influence, are important inducements
with the general partner to enter into the contract.   Does
a limited partnership survive the death of the special part-
ner ?   Then it is compulsory on the survivor to receive into
the partnership, at all hazards, the executor or administra-

tor of the deceased, his next of kin, a creditor or stranger taking administration, or the assignee of such personal representatives; and whatever may be the inconvenience and hardship of being thus thrown, against his will, into connection with a stranger, or perchance with some one personally disagreeable, or hostile, the general partner must submit to the examination of the books, the visits, and the advice of the incomer. (*Gow on Part.*, § 3, *p.* 220; *Collyer*, 3d *Am. ed.*, *p.* 99.) The joint stock companies, many of which exist in England, often comprise a large number of persons, and though generally managed by officers chosen at elections held by the stockholders, they are liable to the application of the same rules of law in regard to death and dissolution, as general partnerships, unless provision be made to meet the case, in the deed of settlement, or articles of agreement. (*Collyer*, §§ 1112, 1113, 1115.)

The system of limited partnerships, which was introduced by statute into this State, and subsequently very generally adopted in many other States of the Union, was borrowed from the French Code. (3 *Kent*, 36; *Code de Commerce*, 19, 23, 24.) Under the name of *la Société en commandite*, it has existed in France from the time of the middle ages; mention being made of it in the most ancient commercial records, and in the early mercantile regulations of Marseilles and Montpelier. In the vulgar Latinity of the middle ages it was styled *commenda*, and in Italy *accomenda*. In the statutes of Pisa and Florence, it is recognized so far back as the year 1160; also in the ordinance of Louis-le-Hutin, of 1315; the statutes of Marseilles, 1253; of Geneva, of 1588. In the middle ages it was one of the most frequent combinations of trade, and was the basis of the active and widely-extended commerce of the opulent maritime cities of Italy. It contributed largely to the support of the great and prosperous trade carried on along the shores of the Mediterranean, was known in Languedoc, Provence, and Lombardy, entered

42

into most of the industrial occupations and pursuits of the age, and even travelled under the protection of the arms of the Crusaders to the city of Jerusalem. At a period when capital was in the hands of nobles and clergy, who, from pride of caste, or canonical regulations, could not engage directly in trade, it afforded the means of secretly embarking in commercial enterprises, and reaping the profits of such lucrative pursuits, without personal risk; and thus the vast wealth, which otherwise would have lain dormant in the coffers of the rich, became the foundation, by means of this ingenious idea, of that great commerce which made princes of the merchants, elevated the trading classes, and brought the Commons into position as an influential estate in the commonwealth. Independent of the interest naturally attaching to the history of a mercantile contract, of such ancient origin, but so recently introduced where the general partnership, known to the Common Law, has hitherto existed alone, I have been led to refer to the facts just stated, for the purpose of showing that the special partnership is, in fact, no novelty, but an institution of considerable antiquity, well known, understood, and regulated. Ducange defines it to be, "SOCIETAS MERCATO-RUM *qua uni sociorum tota negotiationis cura commendatur, certis conditionibus.*" It was always considered a proper partnership, *societas,* with certain reserves and restrictions; and in the ordinance of Louis XIV., of 1673, it is ranked as a regular partnership. In the Code of Commerce it is classed in the same manner. I may add, as an important fact, for the explanation of a distinction to which I shall shortly advert, that the French Code permits a special partnership, of which the capital may be divided into shares, or stock, transmissible from hand to hand. In such a case, the death of the special partner does not dissolve the firm, the creation of transmissible shares being a proof that the association is formed *respectu negotii,* and not *respectu personarum;* but even in such a partnership the death of the general partner effects a dissolution, unless it

is expressly stipulated otherwise. But, says M. Trop-long, it would be wrong to extend the rule that a partner-ship, of which the capital is divided into transmissible shares, is not dissolved by the death of a shareholder, to a special partnership, the capital of which is not so divided. The statute of New-York recognizes only the latter kind of partnership, the names of the parties being required to be registered, and any change in the name working a dissolu-tion, and turning the firm into a general partnership. Such a partnership has always been held to be dissolved by the death of the special partner. This Society, says the au-thor just cited, "*reste alors sous l'empire du droit com-mun. Elle a formé entre le commanditaire et le comman-dité, un lien qui n'a pas été subordonné au caprice de muta-tions imprévues ; elle a engendré des rapports mutuels de confiance, que le commandité ne peut être forcé d'etendre à des personnes étrangères.*" This partnership remains under the dominion of the Common Law. It has created between the special and the general partner a tie, which is not subjected to the caprice of unforeseen changes ; it has produced mutual relations of confidence, which the general partner cannot be forced to extend to strangers. (*M. Trop-long Com. ; du contrat de Société civile, &c., T. 1. Preface,* 57, § 377, *&c. ; T.* 2, § 888, *p.* 368.) The French jurists generally take the same position, defining the special part-nership as a proper partnership, and applying the law of dissolution by death to all. (*Pothier Traité du contrat de Société, ch.* 2, § 2 ; *ch.* 8, § 3 ; *Merlin Répertoire, de Ju-risprudence, Art. Société,* § 7 ; *Duranton, Droit Francais, tom.* 17, l. 3, *Tit.* 9, § 470.) Pardessus discusses the ques-tion somewhat at length. (*Droit Commercial, tom.* 4, *Pt.* 5, *Tit.* 3, *ch.* 1, § 4.) It might be thought, he says, with some appearance of plausibility, that the rule of a dissolu-tion by death should be limited to general partnerships, in forming which, the probity and intelligence of each mem-ber have been reciprocally taken into consideration. In-deed, the special partnership does not suppose on the part

of the general partners any personal confidence in the special partners; and as the interests and the rights of the latter are exclusively limited to their shares, it would seem they were not modified by their decease, and their heirs called to take their place could have no right to insist that death has dissolved the firm, nor the general partners insist upon that result. These reasons, to question the general rule, appear, nevertheless, to yield to others more decisive. The persons and the character of the special partners have been regarded by the general partners when they formed this kind of association. The special partners, are, in effect, to a greater or less extent, called to the annual accountings, to meetings for the settlement of the profits and losses, and to an examination of the state of the affairs. This scrutiny, and a right to insist upon a dissolution in consequence of a breach of the contract, or to urge their claims when the affairs are liquidated, are more or less vigorously exercised. The difficulty of acting harmoniously with different persons, substituted in the place of those with whom the original contract was made; the distrust of heirs, who have not the grounds of esteem and confidence which influenced the deceased, and the impossibility of treating easily with minors, are some of the reasons which will not permit special partnerships to be excepted from the general rule. It may be objected that these reasons apply only in favor of the general partners, and that it is for them to judge as to the continuation of the business with the heirs. But the heirs of the deceased ought to enjoy the same privilege. Reciprocal rights ought to result from a mutual agreement. There is no solid reason why the special partnership should not be dissolved by the death of one of the partners, except when the capital is divided into transmissible shares, in which case the associates having consented that each may substitute another in his place, as he may desire, without the authority of the others, it is natural to conclude that the heirs of a deceased member fill his place in the same manner as if he had as-

signed his share.  I have given the substance of the reasoning of Pardessus, and the result he attains has not only the authority of M. Troplong in its favor, but also that of other commentators (*M. M. Malpeyre, et Jourdain, No.* 474; *M. Persil, fils, p.* 344), while it does not appear to have been questioned or doubted.

It thus appears, that in the jurisprudence of that nation whence the peculiar contract of a special partnership has been adopted by us and grafted into our law,—where the system has long existed, is familiarly known, and its nature, qualities, and practical relations to various events and circumstances, have been well considered under the light of no brief experience—the effect of the death of the special partner is to dissolve the firm.  This agrees with the conclusion I had attained upon independent reasoning, before consulting these authorities, and I am consequently led to pronounce the firm in which the testator was a special partner, dissolved at his death; and to hold the executor, who was his general partner, responsible for the testator's interest in the firm at that time, upon a liquidation of the affairs as if made then.

In accounting upon this basis, some questions of a practical character arise.

The valuation in an inventory is made by the appraisers.  An inventory is not conclusive against executors or administrators, but may be explained.  The inventory was made fifteen months after the testator's decease, and the valuation of his interest in the partnership appears to have been fixed at the original sum put by him into the firm, without any actual examination being made into the affairs of the firm.  There can be no reasonable objection, then, to the executors showing what was the real value of the testator's interest in the copartnership at the time of his decease, April 6, 1842.

\*          \*          \*          \*          \*

I am asked by the counsel of the executors, to estimate the liability of Mr. Hicks at what the stock would have

brought if put up at auction, after deducting the usual auction charges and commissions; and this, on the testimony of the carpet dealers, who give an opinion as to the probable result of such a sale. If Mr. Hicks, the surviving partner, had adopted that course, there would have been more reason for taking such a rule; but why should I speculate, upon the basis of the opinions of witnesses, as to what the stock might have brought if sold at auction, when I know that in fact it was not so sold. The surviving partner retained it, and sold it at retail, and one-third of it at a profit. For that portion he certainly can ask no deduction, and as to the remainder, he ought to pay for it according to its fair market value.

&ast;　　　&ast;　　　&ast;　　　&ast;　　　&ast;

As to allowing auctioneers commissions upon the value of the stock upon a hypothetical sale at auction, it is entirely out of the question. Mr. Hicks, the surviving partner, retained the goods, and traded with them, under a misconception of the law, it is true, but still he did not sell them at auction, and he is to be charged with their value *to him*, and he cannot gain advantage by charging against them expenses he never paid, or commissions that never accrued. This is not punishing him for his mistake of the law, it is only requiring him to pay the value of the goods for which he has made himself liable, as a purchaser, who gives what a thing is worth, without regard to the expenses of the seller, or the commissions of his agent. Nor can Mr. Hicks charge commissions, as surviving partner, for the collection of the debts. His legal duty was to collect the assets and wind up the business of the firm; a duty the law imposes upon him as an incident to the contract of partnership, and for the performance of which no remuneration is promised or implied. Such a claim is new to me, and I am not aware that it is supported by precedent or authority.