[No. D010325. Fourth Dist., Div. One. Nov. 19, 1991.]

GARY J. KAZANJIAN, Plaintiff and Appellant, v.
RANCHO ESTATES, LTD., et al., Defendants and Respondents.

**COUNSEL**

Jones, Hatfield, Penfield, Barden & Finegold and Thomas E. Polakiewicz for Plaintiff and Appellant.

Raffee, Edwards & Leuthold and Richard R. Leuthold for Defendants and Respondents.

**OPINION**

**FROEHLICH, J.—**

### BACKGROUND

Gary J. Kazanjian (Kazanjian) owned a parcel of undeveloped property in Rancho Santa Fe. He experienced financial difficulty in servicing the encumbrances on the property, and determined he would be required either to sell or find some means of developing the property in order to avoid foreclosure by the lienholders. Kazanjian contacted Herbert Hops of the Hops Development Corporation (Hops) for assistance in resolving his problem.

Hops advised that construction of a high-value residence on the Kazanjian property would be profitable. The plan was to utilize Kazanjian's equity in the property to obtain the necessary financing for construction. Hops could add nothing to the financial credibility of the project, however, because he had recently suffered foreclosures on two properties he owned, resulting in impairment of his credit. It was concluded that the parties would need additional financial guarantees to make the project work.

The added guarantor was found in the person of Lawrence Haber (Haber). Haber agreed to lend his financial credit to the venture in return for an interest in profits. Upon the advice of Hops, who had had experience in such structures previously, the enterprise was established as a limited partnership. Kazanjian was to contribute his realty in return for a limited partner's interest. Hops was to contribute, as a general partner, his services and

expertise. Haber's contribution was his advancing credit to the partnership by becoming a general partner, thus providing an unlimited guarantee of partnership obligations. While none of the three partners expected to advance additional cash to the venture, the agreement did contain a provision permitting assessments for additional capital contributions. No assessments were ever made. However, Hops advanced sums from time to time for the benefit of the project, and claimed a right of reimbursement when the project was completed.

The partnership agreement gave Hops broad authority to manage the business of the partnership. The object of the venture was to plan and construct a residence on the realty, to obtain and utilize appropriate financing, to sell the finished product for a profit, and upon sale to divide the proceeds and terminate the partnership. At time of dissolution Kazanjian was first to recover the equity in his realty as of the time of commencement of the venture, a sum later determined to be $101,001. The balance of available funds was then to be divided (after payment of all debts and return of any "advances" made by partners) 40 percent to Hops, 30 percent to Haber and 30 percent to Kazanjian.

During the period of the venture Hops was engaged in other construction projects. An urgent obligation came due which he could not meet. Unbeknownst to his two partners, but in accordance with literal authority vested in him by the partnership agreement, Hops imposed an encumbrance upon partnership property to secure the loan which provided the necessary funds. Hops intended to repay the loan on the sale of the completed residence, and testified that he assumed there would be sufficient funds to his credit to cover the amount of the misappropriation. The improper lien was not discovered by the other partners until sale of the new residence was in process. At that time they agreed to pay off the stray lien rather than contest it, in order to terminate the transaction and obtain funds from the sale.

The construction had taken longer than expected. The building cost more than the partners had projected. The market for high-priced homes turned out to be soft. The net result of these factors was that the proceeds from sale were insufficient (after payoff of the unauthorized lien) to return all advances and Kazanjian's $101,001 entitlement. Kazanjian brought suit. The matter was referred to a referee for an accounting. The referee, after a full hearing on the merits, calculated the partnership dissolution accounting by excluding consideration of the payoff of the unauthorized lien (or, alternatively, upon the hypothetical assumption that Hops would reimburse the partnership for the amount of the diversion). On this basis the referee determined that Hops was entitled to a return of certain advances, that

Kazanjian was entitled to a return of his $101,001, and that a small profit of some $2,295 remained, which should be split 40-30-30 in accordance with the partnership agreement. However, because the foreign lien funds in the sum of $45,998 had been first removed, the remaining cash was insufficient to return Kazanjian his full entitlement, much less pay anything by way of profit to the partners.

The trial court rendered judgment in accordance with the referee's findings. The judgment included an appropriate award in favor of the partnership and against Hops, in recognition of Hops's misappropriation of the funds resulting from the foreign lien. Since the misappropriated sums directly caused Kazanjian's loss, the court also awarded judgment against Hops and in favor of Kazanjian in the net amount of the loss (some $41,884 and also hefty punitive damages). The court denied Kazanjian's claim against Haber, however, finding that Haber was "not personally liable to the limited partner, Gary J. Kazanjian, for damages suffered caused by the acts of the co-general partner, Hops Development Corporation."

On appeal, the mathematics and basic factual findings of the referee, as adopted by the court, are not challenged. The appeal directs itself to the question of Haber's liability for Hops's misdeeds. As might be expected, Hops and his corporation are now bankrupt, and Kazanjian's only practical source of recovery for his lost equity is the deep pockets of Haber, the "financial" general partner.

### ISSUE PRESENTED

The issue thus presented is: When a limited partner suffers loss because of the misappropriation of partnership funds by one general partner, is the other general partner liable jointly to the limited partner for such loss? Surprisingly, this question seems not previously to have been answered, either in terms of provisions of the uniform partnership acts or by judicial decision.

### DISCUSSION

We conclude that an innocent general partner is not jointly and severally liable with a malfeasant general partner for misappropriations which cause loss to a limited partner. We believe the general partner's exposure to liability to a limited partner should not be as extensive as his potential liability to creditors. However, we reverse the decision of the trial court because it did not consider partners' rights and obligations of contribution when dissolution results in loss. A proper consideration of such rights would

result in a sharing of limited partner Kazanjian's loss by general partner Haber.

At the outset, we dismiss arguments based upon classification of the tortious partner's acts as either within or outside the scope of business of the partnership. It may be presumed that the typical partnership agreement will hardly ever contain a provision authorizing misappropriation of partnership funds by a general partner. While the partnership agreement gave Hops, in this case, the power to execute liens on partnership property, it did not authorize him in the process to steal money from the partnership. On the other hand, it is clear that tortious acts done in connection with, or in the process of, the business of the partnership will subject the general partners to liability to creditors. (See *Blackmon* v. *Hale* (1970) 1 Cal.3d 548 [83 Cal.Rptr. 194, 463 P.2d 418]; innocent partner in law firm liable for misappropriation of client trust funds by copartner). However, the fact that a misdeed will subject all partners to liability to a creditor does not necessarily mean the misdeed causes equal liability to a losing limited partner.

We state the obvious when we remind that a limited partner in his capacity as a limited partner is not a creditor. To find what the limited partner's rights are we look to the Revised Uniform Limited Partnership Act, as contained in Corporations Code section 15611 et seq. Corporations Code section 15643, subdivision (b) states: ". . . Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners."

■ The word "partner" in the California Revised Limited Partnership Act means both a general and a limited partner. (Corp. Code, § 15611.) Literally, therefore, except as particularly provided otherwise either by the agreement or the act, the liability of a general partner to a limited partner is identical to his liability to another general partner.

The obligations of a misappropriating partner are set forth in Uniform Partnership Act section 21, subdivision (1), contained in Corporations Code section 15021, subdivision (1): "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners. . . ." It is notable in this reading that the accounting is to the partnership, rather than to individual copartners. ■ It is also to be noted that the misappropriating partner holds "as trustee" the profits improperly derived. Partnership law thus incorporates the fiduciary concepts generated in trust law. (See *Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1150 [265 Cal.Rptr. 330]: "[W]hen a partnership is cre-

ated, the parties acquire rights and duties based on a fiduciary relationship.") Civil Code section 2239 (at the time applicable to this case) provided that "[a] trustee is responsible for the wrongful acts of a co-trustee to which he consented, or which, by his negligence, he enabled the latter to commit, but for no others."[1] Thus, cotrustees, and hence also copartners, are not liable for loss caused by misdeeds of their cofiduciaries unless they are personally in some way at fault—either by participating in the tort through consent or otherwise, or by negligence in permitting it to occur. (*Gbur v. Cohen* (1979) 93 Cal.App.3d 296, 302 [155 Cal.Rptr. 507]; *Cagnolatti v. Guinn* (1983) 140 Cal.App.3d 42, 49 [189 Cal.Rptr. 151].)

The referee and the trial court found that Haber was ignorant of Hops's misappropriation. It also inferentially found Haber not to have been negligent in permitting Hops's misdeed. In view of the special nature of Haber's participation, as a person providing credit but not expected to participate in the partnership's business activities, the finding of nonnegligence is logical and surely supported by the evidence. We therefore conclude that the court was correct in denying Kazanjian's claim against Haber, in terms of rejecting the concept that Haber as general partner should be answerable directly to the limited partner, as he would have been to a creditor.

This conclusion does not, however, provide a complete answer to the limited partner's claim. The rights and obligations of partners *inter se* are regulated by Uniform Partnership Act sections 18, subdivision (b), and 40, subdivision (d) (Corp. Code, §§ 15018, subd. (b) and 15040, subd. (d)). A partner who has paid more than his share of partnership obligations is entitled to indemnification from the partnership. If the partnership is unable to provide such indemnification, the partners must contribute the sums necessary to satisfy its liabilities. Most important, as provided by Corporations Code section 15040, subdivision (d), "if any, but not all, of the partners are insolvent, or . . . refuse to contribute, the other partners shall contribute their share of the liabilities, and, in the relative proportions in which they share the profits, the additional amount necessary to pay the liabilities."

These provisions are analyzed and explained in Bromberg and Ribstein on Partnership, volume II (1988) section 6.02, subdivision (c), pages 6:14

---

[1]The case of *Reynolds v. Mitchell* (Ala. 1988) 529 So.2d 227 relied upon by Kazanjian is inapposite. While that opinion did hold two general partners liable to their limited partners for the misdeeds of a third general partner, those misdeeds were "in the ordinary course of the partnership's business." (*Id.* at p. 230.) It is undisputed that Hops encumbered partnership property for a personal debt, an action clearly outside the ordinary scope of the partnership business. Thus the *Reynolds* predicate for liability of both general partners is absent.

through 6:18. The obligation to share losses according to the division of profits applies where the losses result in consumption of capital of the business. The partnership loss in this case resulted from the misappropriation of funds by a general partner, and that general partner, Hops, is obligated to return the funds to the partnership. When, however, this entitlement is uncollectible, its effect is the same as any other loss through imprudent or unsuccessful partnership operation. It is a loss which, being uncollectible, has impaired partnership capital. From the calculations of the referee in this case, we can see that capital has been impaired to the extent of some $45,000. Since Hops is insolvent, the contribution to partnership capital to remedy the loss falls upon the remaining two partners: Kazanjian and Haber. Under Corporations Code section 15040, subdivision (d), this loss should be allocated to them in accordance with their partnership profit ratios, which being 30 percent and 30 percent means the loss should fall equally upon them.

It must be acknowledged that this analysis is made without reference to the special status of a limited partner. The mechanics of Corporations Code section 15040, subdivision (d) (Uniform Partnership Act, § 40, subd. (d)) appear to contemplate actual replacement of funds by partners to the partnership account, to be followed by disbursement of the funds. Since a limited partner cannot be required to contribute funds beyond his stated investment (and here we overlook the possibility of assessment contained in this agreement) he cannot be dunned for an additional assessment. This does not, we apprehend, preclude an accounting for distributions on dissolution which takes into account the concepts of contribution.

In this case, for instance, absent the application of contribution the entire loss from partnership misfortune falls upon Kazanjian because of the happenstance that he provided the entire initial capital for the partnership. Had a profit been made in the business, Haber would have shared it to the extent of 30 percent. It is entirely reasonable that he participate in the losses to the same 30 percent (or, excluding Hops because of his insolvency, to the extent of 50 percent of the remaining solvent partners). We emphasize, however, that this assignment of loss to Haber is based entirely upon concepts of partnership contribution, and *not* upon any special obligation of a general partner to protect a limited partner from loss in terms of joint liability with another malfeasant general partner.

CONCLUSION

We have analyzed the responsibilities of partners in a limited partnership in terms of contribution to repair impaired capital. While interesting, we believe this conclusion merely reflects clearly stated statutory provisions and

represents no innovative thinking in terms of partnership law. We reverse on this ground, but only to require a more complete and accurate accounting on dissolution of this partnership.

The decision reached herein which we believe is somewhat original, and which has given us the most difficulty in terms of resolution, is the decision limiting liability of general partners for the misdeeds of their cogeneral partners. There is no need to cite precedent for the premise that when a general partner commits torts in connection with the partnership business which cause loss to creditors, all general partners are jointly and severally liable. We have thought, in working through this opinion, that the same obligations might well pertain to limited partners. The limited partner is, in some respects, like a creditor of the partnership. Like the creditor, the limited partner has no control of the partnership business. He is entirely dependent upon the general partners for the care and protection of his investment. One could posit the proposition that the nature of a limited partnership is that of a general partnership (composed of the several general partners) who together are in business for the objective of returning a profit to the limited partner. Such concept would impose on all general partners the obligation of protection of the limited partner and joint and several liability for the misappropriation by any general partner.

We have concluded, however, that the statutory framework created by the uniform partnership acts does not provide such broad scope of liability. Further reflection and research respecting the objectives of limited partnership status seem to justify this conclusion. The Uniform Limited Partnership Act, first adopted in 1916, was based upon two fundamental assumptions. The first assumption was that public policy did not require limited partners to become bound for partnership obligations. The second was: "That persons in business should be able, while remaining themselves liable without limit for the obligations contracted in its conduct, to associate with themselves others who contribute to the capital and acquire rights of ownership, *provided that such contributors do not compete with creditors for the assets of the partnership*." (6 West's U. Laws Ann. (1969) U. Limited Partnership Act, § 1, comrs. note, p. 564, italics added; see also 2 Barrett & Seago, Partners and Partnerships, Law and Taxation (1956) Limited Partnerships, § 1.2, p. 490; 2 Rowley on Partnership (2d ed. 1960) Limited Partnerships, § 53.0, p. 551.)

■ Thus, it appears that the key differences between the limited and general partners are (1) limitation of liability of the limited partner to his investment, in return for which (2) the limited partner relinquishes all right of business management. The limited partner remains a "partner" in the sense that he participates in profits and losses of the business. It does not

seem violative of this status to deny the limited partner the guarantee of all general partners of the propriety of the acts of each of them. Innocent general partners, *inter se,* are obviously not responsible for the misdeeds of one of their number—the contribution provisions of Corporations Code section 15040, subdivision (f) provide for payment by a partner only "to the extent of the amount which he has paid in excess of his share of the liability." Nothing to the contrary appearing in the uniform acts, there would appear no good reason for modifying this rule of nonliability for the claims of loss of a limited partner.

## DISPOSITION

The trial court's accounting for partnership transactions and its determinations of the liability of Hops to the partnership and to the other partners are affirmed. The judgment denying Kazanjian's claims against Haber is reversed, and the case is remanded for further consideration by the trial court, to determine the amount which should be paid by Haber to Kazanjian in accordance with the contribution provisions of the Uniform Partnership Act (Corp. Code, § 15040, subd. (d)). Kazanjian is entitled to costs on appeal.

Huffman, Acting P. J., concurred.

**NARES, J.,** Concurring and Dissenting.—I concur with the majority's result, but not its reasoning, insofar as it determines that general partner Haber is not directly liable to limited partner Kazanjian because of the misappropriation of funds by general partner Hops. I part company with the majority, however, on the question of whether Haber, despite his lack of "primary" liability under any of several theories argued below, should nonetheless be liable to Kazanjian on the "secondary" theory of contribution.

The majority errs in three respects. First, it reverses the trial court on a theory never advanced below or on this appeal, which is improper, while ignoring the admitted fact that Kazanjian elected to pay the improper claim, which estops him from now asserting payment of the lien was improper. Next, apart from the lack of objection below and estoppel, the result reached by the majority is erroneous as a matter of law, resulting in the judicial creation of a heretofore-unknown entity, a "guaranteed" limited partnership. Last, the result reached (including the award of costs to appellant) is inequitable on the facts of the case before us. Because this result is improper, erroneous, and inequitable, I dissent from the reversal, but otherwise concur with the majority's result on the only question which is properly before us.

## I. Point Not Raised Below

This case was litigated on the *single* question of whether general partner Haber was liable to limited partner Kazanjian for a misappropriation by general partner Hops. As the majority recognizes, Kazanjian's claim rests on his assertion he should be treated as a partnership creditor, and this conflicts with the fundamental nature of limited partnerships, in which limited partners are *not* to be treated as third party creditors.

This resolution embraces all of the issues argued before the referee, the trial court and this court. (The majority recognizes resolution of the only question presented by the parties is the significant portion of its opinion.) Yet the majority, after requesting the views of the parties on matters never presented to the referee or argued to the trial court, reverses on a theory argued for by no one.

While reversing on a point never raised by the parties, the majority ignores the rule requiring affirmance of a correct judgment even if an improper theory for affirmance has been articulated below. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) A dispositive factor clearly presented by this record is the question of estoppel.[1] As the majority admits, both Haber and Kazanjian first discovered the improper Hops lien while "sale of the new residence was in process. At that time they agreed to pay off the stray lien rather than contest it, in order to terminate the transaction and obtain funds from the sale." (Maj. opn., *ante*, p. 1624.)

As Hops's acts were outside the scope of the partnership business, the unratified conduct of Hops in giving a security interest in partnership property to secure his personal debt could not, as a matter of law, create an effective lien. "An act of a partner which is not apparently for carrying on the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." (Corp. Code, § 15009, subd. (2); see also 2 Ballantine & Sterling, California Corporation Laws (4th ed. 1991) Partnership, ch. 24, §§ 607.03-608.01.)

It is clear that "a mortgage executed against partnership property by one partner only to secure his individual debt, and without the consent of his associate partners, conveys no title and creates no lien upon the property of the partnership or against nonconsenting partners." (*Shwartzler* v. *Lemas* (1938) 12 Cal.2d 54, 59-60 [82 P.2d 419]. See also *Ellis* v. *Mihelis* (1963) 60 Cal.2d 206, 217-218 [32 Cal.Rptr. 415, 384 P.2d 7]; *Owens* v. *Palos Verdes*

---

[1]"The law of estoppel shall apply under [the Uniform Partnership] act." (Corp. Code, § 15004, subd. (2).)

*Monaco* (1983) 142 Cal.App.3d 855, 864-865 [191 Cal.Rptr. 381]; Corp. Code, § 15010, subd. (1).)

A partner is accountable for benefits "derived by him without the consent of the other partners." (Corp. Code, § 15021, subd. (1).) "Such consent clearly can be given in connection with a specific transaction." (2 Bromberg & Ribstein on Partnership (1988) § 6.07, subd. (h), p. 6:89.) Here the consent by Kazanjian to payment of the Hops debt constituted ratification of the improper obligation. Ratification "may be implied through acquiescence, if the co-partners learn of it, and fail to repudiate it within a reasonable time." (Reuschlein & Gregory, The Law of Agency and Partnership (2d ed. 1990) Ratification, § 201, p. 305. See also *Rakestraw* v. *Rodrigues* (1972) 8 Cal.3d 67, 73 [104 Cal.Rptr. 57, 500 P.2d 1401]; *Young* v. *Rosenthal* (1989) 212 Cal.App.3d 96, 117 [260 Cal.Rptr. 369]; and *Price* v. *Slawter* (1962) 209 Cal.App.2d 608, 614 [26 Cal.Rptr. 227].) As the time for repudiation of the Hops obligation is long past, the appeal should be affirmed on this basis. However sound the reasons for paying rather than contesting the improper lien, the fact remains that such an election ought to be binding.

## II. INDEMNIFICATION AND CONTRIBUTION

The majority errs also in determining Haber is liable to Kazanjian under principles of indemnification (Corp. Code, § 15018, subd. (b)) and contribution (Corp. Code, § 15040, subd. (d)), although under no primary theory of liability. The majority first points out that "[a] partner who has paid more than his share of partnership obligations is entitled to indemnification from the partnership. If the partnership is unable to provide such indemnification, the partners must contribute the sums necessary to satisfy its liabilities." (Maj. opn., *ante*, p. 1627.)

I have no quarrel with this as a statement of principle. It has, however, no application to the facts of this case. The statute relied upon to establish the limited partner's right of "contribution" is Corporations Code section 15040, subdivision (d). As Kazanjian's own counsel recognizes, the statute was "obviously drafted with the third party debts of a general partnership in mind" and "should be interpreted to account for the contributions between general partners." This is a correct analysis. "The purpose of [Corporations Code section 15040] is for the protection of creditors." (*Price* v. *Slawter*, *supra*, 209 Cal.App.2d at p. 611.)

Corporations Code section 15632, subdivision (a), states in pertinent part: "A limited partner is *not liable for any obligation* of a limited partnership." (Italics added.) Corporations Code section 15636, subdivision (a), states:

"No limited partner shall be required to make any additional contribution to the limited partnership." This is the entire point of a limited partnership: A limited partner does not share in the liability of the general partners, and also cannot be forced to contribute more to the partnership. If a limited partner is not liable for "any obligation" of the partnership, and cannot be required to make contributions, Corporations Code section 15040, subdivision (d), necessarily has no application. "Reciprocal rights ought to result from a mutual agreement." (*Ames* v. *Downing* (1850) 1 Bradf. 321, 332.) The majority here creates a *nonreciprocal* right of contribution on behalf of a limited partner, which could not be enforced against him. This radical alteration in the operation of a millenium-old institution is based upon a wholly mistaken view of its purposes.

The majority's fundamental error stems from its admitted preconception that general partners *ought* to be liable to their limited partners for losses. (Maj. opn., *ante*, p. 1629.) While unable to fit this premise into the framework of the law, the majority nonetheless expresses the startling notion that a proper view of a limited partnership is one in which the general partners "are in business for the objective of returning a profit to the limited partner." (*Ibid.*) "The idea at first impression is apt to win attention if not favor, but on closer scrutiny cannot, I think, be upheld." (*Ames* v. *Downing, supra,* 1 Bradf. at p. 325.) Indeed, this perception stands history on its head, and makes nonsense of the law.

As a cursory review of the history of limited partnerships reveals (see, e.g., *Ames* v. *Downing, supra,* 1 Bradf. at pp. 325-330, and *Evans* v. *Galardi* (1976) 16 Cal.3d 300 [128 Cal.Rptr. 25, 546 P.2d 313]), they were intended to provide a means for idle capital to be invested in enterprises operated and directed by others, without liability for business debts past the amount of the investment. The price of this limitation on liability was a corresponding limitation on direction and control of the business. Thus a limited partner provides fuel for the enterprise, but no more.

Competition and its inherent risk are central to capitalist theory. Insofar as the majority transforms a speculation into an "entitlement," which must be repaid by "contributions" from any solvent general partner, it reduces the risk associated with speculation, but at the price of necessarily constraining competition. Requiring general partners to manage their business so as never to impair the value of a limited partner's capital investment, on pain of having to "contribute" to any impairment, enhances the position of current limited partners. It also, however, reduces the utility to general partners of such investments, to the likely future detriment of all.

Again, the purpose of the statutes providing for limited partnerships was "to encourage investing." (*Gilman Paint & Varnish Co.* v. *Legum* (1951) 197

Md. 665 [80 A.2d 906, 908, 29 A.L.R.2d 286].) One consequence is clear. "A limited partnership is in the nature of an investment. [Citation.]" (*Allen* v. *Amber Manor Apartments Partnership* (1981) 95 Ill.App.3d 541 [51 Ill. Dec. 26, 420 N.E.2d 440, 445].) From this also follows the fact that "when the limited partner makes the contribution, he is placing that amount *at risk.* [Citation.] *He is not permitted to insure that risk or to guarantee a return to himself* by taking some form of security. [Citation.]" (*Id.* at pp. 445-446, italics added.) "[T]he issue . . . is . . . whether a limited partner may secure his capital contribution. We conclude that the answer is that he may not." (*Kramer* v. *McDonald's System, Inc.* (1979) 77 Ill.2d 323 [33 Ill. Dec. 115, 396 N.E.2d 504, 507].)

On these authorities it is perfectly clear that limited partners determine to place the amount of their contribution at risk. Their liability may be *limited* to the amount of that contribution, but is necessarily coterminous therewith. As the body of cases interpreting limited partnerships compels the uniform conclusion that a limited partner's interest is at risk, and in fact may not lawfully be secured or guaranteed,[2] the invention by the majority herein of a right of contribution to ensure that interest is contrary to both law and reason.

### III. INEQUITABLE RESULT

This is a proceeding in equity. I believe that so far as possible in these matters, we ought to strive for a result not only lawful, but just. The result announced by the majority is neither. I have set forth above my view that the result does not comply with the law. It is beyond arguing that, on the facts of this case, forcing a large further expenditure by Haber for the benefit of Kazanjian is most unjust. From this record it is apparent that only through Haber's intervention, at the request of the others, was Kazanjian given an opportunity to avoid foreclosure on whatever equity he had in his property. While he has not received all of the benefits he hoped for from the partnership, he has probably received more than he might have had he instead elected simply to sell raw land in a declining market.

The award of costs to Kazanjian is also inequitable. As to what the majority admits is the primary question on this appeal the judgment is affirmed. On a subsidiary question the majority grants relief to Kazanjian, but on no theory ever advanced on his behalf, and indeed on a theory properly rejected by his counsel. The costs award merely wreaks further ruin

---

[2] A limited partner may apart from his initial contribution make loans to the partnership and receive security therefor so long as partnership assets are sufficient to pay creditors. (*Grainger* v. *Antoyan* (1957) 48 Cal.2d 805, 813 [313 P.2d 848], followed in *Hughes* v. *Dash* (5th Cir. 1962) 309 F.2d 1, 3.)

upon an entirely innocent partner, who has long ago regretted the day he yielded to the blandishments of Hops and Kazanjian and embarked upon this painful course.

## IV. SUMMARY

The majority's determination to reverse this matter for the purpose of requiring that a speculative investment be partially secured has resulted in a violation of appellate procedure, clear error, and inequity. For all of the reasons set forth above, I would affirm the judgment in its entirety, and order that Haber, for whatever small solace it might grant, recover his costs on appeal.