In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-4141

MARK FRITCHER and COUNTRY TRUST BANK,

*Plaintiffs-Appellees,*

*v.*

HEALTH CARE SERVICE CORPORATION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-1210—**John A. Gorman**, *Magistrate Judge.*

ARGUED JUNE 4, 2002—DECIDED AUGUST 23, 2002

Before COFFEY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiffs Mark Fritcher ("Fritcher") and Country Trust Bank ("the Bank") sued Defendant Health Care Service Corporation ("HCSC") for failing to pay benefits that the plaintiffs alleged were due under Fritcher's employee benefit plan, which HCSC administered. The district court granted the plaintiffs' motion for summary judgment, and HCSC appeals. We affirm.

## I.  FACTUAL BACKGROUND

Fritcher works for Mitsubishi Motor Manufacturing of America ("MMMA") and is a participant in the MMMA employee benefit plan ("the Plan"). The parties agree that the Plan is an employee welfare benefit plan governed by ERISA. (Def.'s Br. at 8; Pl.'s Br. at 7.) *See* 29 U.S.C. § 1001, *et seq*. The Bank is the trustee of the Lucas Fritcher Trust. Lucas Fritcher, the son of Plaintiff Mark Fritcher, is a beneficiary under the Plan. Lucas was born with certain serious birth defects in 1989, and by virtue of his severe health problems (*e.g.*, severe hypoxic encephalopathy,[1] severe cerebral palsy, frequent daily seizures, cleft palate, cortical blindness, microcephaly,[2] severe mental motor retardation, spastic quadriplegia, an inability to swallow, asthma), (R. at 362-93; Pl.'s Ex. 12), Lucas requires constant medical care or monitoring (*e.g.*, administration of medication, frequent suctioning of his airway, periodic application of oxygen, close monitoring and management of seizures, gastro-intestinal feedings) in order to survive. (R. at 400-04; Pl.'s Ex. 12.)

In 1994, the Plan began assuming the responsibility for Lucas' primary health coverage, and paid for an average of eighteen hours per day of in-home health care for Lucas. In a letter dated March 28, 1997, HCSC sent a letter to Fritcher notifying him that effective May 1 of that same year, the Plan would cover "a maximum of two hours per day" for Lucas' care, as anything beyond that

---

[1]  Hypoxic encephalopathy is permanent and irreversible brain damage caused by an inadequate flow of oxygen to the brain. *Dorland's Illustrated Medical Dictionary* 550, 810 (27th ed. 1988). (R. at 366.)

[2]  Microcephaly is a condition in which neither the skull nor the brain grows because of some injury to the brain. *Dorland's Illustrated Medical Dictionary* 1032 (27th ed. 1988). (R. at 392.)

would be deemed to be "custodial care" and not "medically necessary" under the terms of the Plan. HCSC asserted that most of the in-home care Lucas was receiving did not qualify as "Skilled Nursing Services" under the Plan.

The term "Skilled Nursing Services" is defined under the "Definitions" section of the Health Care Service Plan document as "those services provided by a registered nurse (R.N.) or licensed practical nurse (L.P.N.) which require the technical skills and professional training of an R.N. or L.P.N. . . . ." The definition adds that "Skilled Nursing Service does not include Custodial Care Service." "Custodial Care Service," meanwhile, is defined under the Plan as "those services which do not require the technical skills or professional training or medical and/or nursing personnel in order to be safely and effectively performed." Under the "Exclusions—What Is Not Covered" section of the Plan, "Custodial Care Service" is specifically delineated as a type of service that is not "Medically Necessary" under the terms of the Plan.

HCSC's determination to reduce benefits was based largely on the work of one Dr. Robert Fucik. Fucik, a part-time practicing endocrinologist, acknowledged at trial that he was not board-certified in any field, including endocrinology. Fucik, a twenty-year HCSC employee, determined after a review of the record that whatever "skilled nursing care" Lucas was receiving could be administered over the course of a one to two hour period. Fucik admitted that he made his determination without reference to Lucas' need for skilled medical care throughout the day and not simply during a one to two hour period. (R. at 582.) Fucik also conceded that he made his decision without reference to the number of times a day Lucas had seizures, (R. at 587), which Lucas' pediatrician noted as "frequent," even up to twenty times per day. (Pl.'s Ex. 66.)

After receiving HCSC's March 28, 1997 letter curtailing his son's benefits, Fritcher took some action that apparently satisfied his obligation under the "Claim Review Procedure" outlined in the Plan. (Pl.'s Ex. 8 at 69.)[3] Just two months after its first letter, HCSC responded to Fritcher's request for "additional information regarding [HCSC's] recent review of the nursing notes and subsequent determination of the services being provided as custodial care." (Pl.'s Ex. 9.) In this letter, dated May 28, 1997, HCSC repeated its assertion that "the services being provided represent approximately 2 hours daily which fulfill the technical and professional training of an RN or LPN," and maintained its position that "as of 5/1/97, benefits will be limited to 2 hours a day." (*Id.*)

## II.  PROCEDURAL POSTURE

On June 26, 1998, Fritcher and the Bank timely filed an action in federal district court under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking judicial review of the Plan administrator's decision to deny benefits. In November 1999, the matter was tried in a bench trial before the Honorable Michael P. McCuskey, United States District Court Judge. Before rendering his opinion, Judge McCuskey recused himself in an order dated June 8, 2000 because of his own

---

[3] This circuit has long recognized that district courts have discretion to require administrative exhaustion, and that we will overturn a district court's decision only for a clear abuse of discretion. *See Gallegos v. Mt. Sinai Med. Ctr.*, 210 F.3d 803, 808 (7th Cir. 2000). Here, even though it is not clear that Fritcher's "ask[ing] for additional information," (R. at 119, p. 6), exhausted his administrative remedies under the Plan, there does not appear to be sufficient reason to disturb the magistrate judge's discretion on this point.

brewing conflict with a division of HCSC. (R. at 96.) The matter was thereupon reassigned to Magistrate Judge John A. Gorman of the Peoria District of the United States District Court for the Central District of Illinois.

In December 2000, the parties filed cross motions for summary judgment. On March 20, 2001, Magistrate Judge Gorman granted summary judgment in favor of the plaintiffs and against the defendant on the issue of liability. On November 15, 2001, the district court awarded damages to plaintiffs and against defendant in the amount of $341,142.03, awarded plaintiffs their attorney's fees and costs in the amount of $112,286.22, and prejudgment interest in the amount of $56,170.11. HCSC filed a notice of appeal on November 30, 2001.

## III.  DISCUSSION

### A.  *The Summary Judgment Grant*

HCSC asks this court to reverse the district court's grant of summary judgment in favor of the plaintiffs. A summary judgment motion must be granted if there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We review a grant of summary judgment *de novo*, viewing all the facts and drawing all reasonable inferences therefrom in favor of the nonmoving party. *See Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).

### *B. The Administrator's Decision*

### 1.

The primary issue in this case is whether the magistrate judge applied the correct standard of review to the plan administrator's decision to deny benefits. It is significant to note at the outset that this court's opinion in *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000), the holding of which is directly relevant to this type of dispute, was decided in February 2000, shortly after the parties' bench trial (in November 1999) but before the magistrate judge had issued his grant of summary judgment in March 2001.

The gravamen of HCSC's argument is that the magistrate judge applied the wrong standard of review when analyzing HCSC's interpretation of Plan language. Specifically, HCSC maintains that its interpretation, as the Plan's "Claims Administrator," of what is "medically necessary" under the Plan ought to have been examined under the deferential "arbitrary and capricious" standard.[4] HCSC

---

[4]  We note in passing that a previous decision from a panel of this court once noted a distinction between the "arbitrary and capricious" standard of review and the "abuse of discretion" standard of review. *See Morton v. Smith*, 91 F.3d 867, 870 (7th Cir. 1996). As we have subsequently pointed out, however, this appears to be a distinction without a difference. *See, e.g., Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998) (noting that whether the administrator "abused its discretion," "acted unreasonably," or "exercised its discretion in an 'arbitrary and capricious' manner" were merely "different ways of saying the same thing"); *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1009 (7th Cir. 1998) (stating that "[t]he distinction between these standards is indeed nebulous"); *Gallo v. Amoco Corp.*, 102 F.3d 918, 921 (7th Cir. 1996) (framing the issue for decision as whether the defendant "had abused its discretion, or what amounts to the same thing, had acted arbitrarily and capriciously").

objects to the magistrate judge's use of the less deferential *de novo* standard. HCSC asserts that Plan language bestowing upon the Plan administrator the right to exercise "reasonable judgment" in determining whether services are medically necessary is a sufficient grant of "discretion" under the law of this circuit to trigger a milder standard of review.

We disagree. As this court held in *Herzberger*, an ERISA plan is "a special kind of contract," in which there exists "a presumption of full judicial review at the behest of the [participant or beneficiary]." *Id.* at 330. Thus, this "presumption of plenary review is not rebutted by the plan's stating merely that benefits will be paid only if the plan administrator determines they are due, or only if the applicant submits satisfactory proof of his entitlement to them." *Id.* at 331. Such truisms do not "give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." *Id.* at 332. Without such notice of the employer's intention "to reserve a broad, unchanneled discretion to deny claims," *id.* at 333, the employee cannot make informed choices about his benefits, such as the decision as to whether he should supplement his ERISA plan with other forms of insurance. *See id.* at 331.

It is clear from the undisputed facts on the record that HCSC has failed to dispel the presumption against plenary review. The language that HCSC cites is simply not sufficient under *Herzberger*. HCSC first claims that the "Plan documents" bestow the requisite degree of discretion upon HCSC. HCSC points to the "Benefit Booklet," a document which the Plan adopted and incorporated by reference that summarized benefits for the participants and beneficiaries. This booklet states that benefits will be provided for services only if they are, "in the reasonable judgment of the Claim Administrator, Medically Necessary."

After a thorough review of the facts and the law, we hold that the phrase "in the reasonable judgment of the Claim Administrator" does not rise to the level articulated by the *Herzberger* court to rebut the presumption of plenary review.[5] In *Herzberger*, this court stated that "[o]bviously a plan will not—could not, consistent with its fiduciary obligation to the other participants—pay benefits without first making a determination that the applicant was entitled to them." *Id.* at 332. The phrase "reasonable judgment of . . . medical[ ] necess[ity]" does not signal subjective discretion; in fact, it implies some process of ratiocination will be used before benefits will be paid. *See id.* at 333 (holding that discretionary power could be presumed only upon a subjective, rather than objective, test). Most importantly, the words "reasonable judgment" do not serve as adequate notice to the participant and his family that the administrator's judgment will be insulated from judicial review, particularly after *Herzberger*. "An employer should not be allowed to get credit with its employees for having an ERISA plan that confers solid rights on them and later, when an employee seeks to enforce the right, pull a discretionary judicial review rabbit out of his hat." *Id.* at 332-33.

---

[5] Judicial review of a plan administrator's decision must, ordinarily, be particularly penetrating when the facts illustrate that an administrator has a conflict of interest. *See*, *e.g.*, *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960 (7th Cir. 2001) (holding that an administrator's conflict of interest "is a factor to be considered" when reviewing an administrator's decision); *Ladd*, 148 F.3d at 754 (stating that when it is clear that the "administrator has a conflict of interest . . . though the standard of review is nominally the same, the judicial inquiry is more searching"); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1050-51 (7th Cir. 1987). Here, however, neither side has argued the issue and therefore we need not address it.

HCSC also points to language in its "Administrative Services Agreement" ("ASA") between HCSC and MMMA as evidence that HCSC enjoys "discretion" under the terms of the "Plan." There are two problems with this argument. First, the language cited—"the Claim Administrator in its sole discretion reserves the right to pay any benefits that are payable under the terms of this Agreement directly to the Covered Employee or to the Provider of the service"—has nothing whatever to do with discretion in awarding benefits. It simply provides that HCSC can pay whomever it wishes in the first instance for services rendered. This court has expressly held that discretionary language appearing in a non-relevant passage of an ERISA plan "does not grant the administrator discretion to determine eligibility for benefits." *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 539 (7th Cir. 2000).

The second problem with HCSC's use of the ASA is that it is not a "plan document" for purposes of holding its terms against a plan participant or beneficiary.[6] *See*, *e.g.*, *Local 56, United Food & Comm. Workers Union v. Campbell Soup Co.*, 898 F. Supp. 1118, 1136 (D.N.J. 1995) ("A formal plan document is one which a plan participant could read to determine his or her rights or obligations under the plan."), citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (noting that one of ERISA's basic purposes was to afford employees the opportunity to inform themselves, "on examining the plan documents," of their rights and obligations under the plan), quoting H.R. Rep. No. 93-1280, at 297 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5077, 5078.

---

[6] Plaintiffs themselves seem confused on this point. *See* Pl.'s Br. at 19 (referring to "paragraph H of the plan," when they obviously mean the ASA).

**2.**

Having established that the standard of review by which we are required to examine HCSC's benefit denial in this case is *de novo*, we now turn to the decision itself. The magistrate judge found that "the plan's decision to cut the benefits it provided to Lucas Fritcher was erroneous," as "[i]t is clear that much of Lucas' care must either be rendered by a registered nurse or by a licensed practical nurse as directed and supervised by a registered nurse."

We agree with the ultimate determination of the magistrate judge, but for different reasons than those he offered in his order. It is not clear from the magistrate judge's March 20, 2001 order what impact the "Nursing and Advanced Practice Nursing Act, 225 Ill. Comp. Stat. 65/5-1 *et seq.*" has on Lucas' care. The passages cited in the order (defining "practical nursing" and "registered professional nursing practice") do not necessarily support the conclusion that Illinois law prohibits a non-licensed health care provider from taking care of Lucas, or that the care Lucas was receiving could be considered "skilled nursing services" under the terms of the Plan.

What is clear from the undisputed facts on the record, however, is that HCSC denied benefits despite its knowledge that Lucas needed "skilled medical care" under the terms of the Plan, that such care should have been covered under the Plan, and that Lucas' need for such care was scattered throughout the day. Dr. Fucik, the HCSC employee who was largely responsible for the benefit reduction, admitted that the periodic monitoring of the oxygen content in Lucas' bloodstream was a skilled service, (R. at 585), and that the periodic monitoring of Lucas' breathing was a skilled service. (R. at 625.) He further admitted that his own notes reflected the fact that Lucas was receiving "a scattering of skilled services" that were

"being provided during approximately 18 hours per daily nursing services." (R. at 581; Dep. Ex. Fucik #3). Dr. Fucik also admitted that he ignored the frequency of Lucas' seizures when making his determination, (R. at 587), even though the nurses' reports—the same ones that Dr. Fucik claimed to have reviewed while making his determination (R. at 541, 548)—showed that Lucas frequently had seizures. (Def.'s Ex. #50.) HCSC obviously knew that for someone in Lucas' condition, monitoring and controlling these seizures is critically important. (Pl.'s Ex. 12; Pl.'s Ex. 55A; Dep. Ex. Fucik #7 at 3.) Based on these facts alone, and without having to examine Illinois law, HCSC's decision to confine benefits to a 2-hour period is patently unreasonable. *See Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir. 1991) (holding that a selective review of medical evidence and a conclusion based on that selectivity was unreasonable). Thus, we affirm the district court's grant of summary judgment in favor of the plaintiffs with respect to liability. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (noting that remand is the appropriate remedy in similar cases except where "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground"). Because we reach our decision on these grounds, we need not address either of HCSC's two remaining arguments: (1) the propriety of the district court's analysis of the "administrative record"; and (2) the applicability of the doctrine of ERISA preemption of the Illinois statute.

### C.  Attorney's Fees and Costs

HCSC argues that the district judge's award of attorney's fees and costs to the plaintiffs was erroneous. ERISA allows a court, in its discretion, to award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C.

§ 1132(g)(1). We review such an award for an abuse of discretion. *See*, *e.g.*, *Trustmark Life Ins. Co. v. Univ. of Chicago Hosps.*, 207 F.3d 876, 884 (7th Cir. 2000); *Little v. Cox's Supermarkets*, 71 F.3d 637, 644 (7th Cir. 1995) (holding that "a district court's determination will not be disturbed if it has a basis in reason").

This circuit has recognized two tests for analyzing whether attorney's fees should be awarded to a "prevailing party" in an ERISA case. *See Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998). The district court below essentially employed the first of these two tests, (R. at 119, p. 9), which looks at the following five factors: (1) the degree of the offending party's "culpability or bad faith"; (2) the degree of the offending party's ability to satisfy an award of attorney's fees; (3) the degree to which such an award would "deter other persons acting under similar circumstances"; (4) the amount of benefit conferred on all the plan members; and (5) the relative merits of the the parties' positions. *Quinn*, 161 F.3d at 478.

In applying these five factors to the facts at hand, the magistrate judge found that "[t]here is some evidence of culpability on the part of the Plan that goes beyond simply an erroneous decision." (R. at 119, p. 9.) The judge pointed to the fact that after the plaintiffs filed suit, HCSC re-evaluated the claim, deciding that an award of twelve hours per day of medical care was appropriate. (Pl.'s Ex. 12.) The judge found this to be "a dramatic turn-around." (R. at 119, p. 9.) The judge viewed with similar dismay "the fact that it took four months for the new payment level to be implemented," as it suggested "at best that the Plan dragged its feet." (*Id.*) The judge also found that the second and third factors weighed in favor of an award to the plaintiffs, as "[t]here is no evidence questioning the ability of the Plan to pay such an award, and there is no question that such an award would serve to

deter this Plan and others from making the kind of superficial evaluation seen in this case, especially when the evaluation has such an enormous impact on the lives of the participants and beneficiaries." (*Id.* at 9-10.) As to the fourth and fifth factors, the judge reasoned that the likely improvements that would be made to the Plan's review procedures could only help all Plan participants, and that the merits of the case "were strongly on the side of plaintiffs." (*Id.* at p. 10.)

Based on our review of the record, the briefs, and controlling law, we find the magistrate judge's award of attorney's fees and costs was reasonable. We also find that the amount of the award, $96,922.50 in attorney's fees and $15,363.72 in costs, was similarly well-reasoned. In his order dated November 15, 2001, the magistrate judge followed the applicable law for such awards. (R. at 141, pp. 2-4.) *See Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983) (holding that the starting point for the calculation of attorney's fees is the "lodestar" amount, or the product of the number of hours reasonably expended and a reasonable hourly rate); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 519 (7th Cir. 1993) (defining a "reasonable hourly rate" as "the rate that lawyers of a similar ability and experience in the community normally charge to their paying clients"). The magistrate judge also carefully scrutinized the record for the reasonability of the award, looking at the attorneys' billing records and rejecting the plaintiff's request for an "enhancement" because, *inter alia*, no new law was made in this case. (R. at 119, p. 5.) We affirm the magistrate judge's finding on both the propriety and the amount of the attorney's fees and costs awarded in this case.

### D. Prejudgment Interest

HCSC argues that the district judge's award of prejudgment interest to the plaintiffs was erroneous. Case law from

this circuit and other circuits suggests that prejudgment interest may be appropriate in ERISA cases. *See, e.g.*, *Trustmark*, 207 F.3d at 885; *Tiemeyer v. Cmty. Mut. Ins. Co.*, 8 F.3d 1094, 1102 (6th Cir. 1993); *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1030 (4th Cir. 1993). We have previously held that "prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). This "presumption in favor of prejudgment interest awards is specifically applicable to ERISA cases." *Rivera v. Benefit Trust Life Ins. Co.*, 921 F.2d 692, 696 (7th Cir. 1991). Whether to award an ERISA plaintiff pre-judgment interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Trustmark*, 207 F.3d at 885, citing *Landwehr v. DuPree*, 72 F.3d 726, 739 (9th Cir. 1995) (quotations omitted).

Contrary to the assertion in HCSC's brief, "bad faith" is not the sole criterion when considering whether an award of prejudgment interest is appropriate. (Def.'s Br. at 52.) *See Trustmark*, 207 F.3d at 885 (citing "bad faith" as "[o]ne of the factors" to be considered). As the magistrate judge pointed out, the award was simply aimed at making the plaintiffs whole, who were forced to deplete their assets in order to provide for Lucas' care during the period in which benefits were wrongly withheld. (R. at 132, p. 4; R. at 141, p. 6.)

The sole remaining issue is our review of the magistrate judge's calculation of the amount of prejudgment interest, another item which is left to the discretion of the district court. *See Gorenstein*, 874 F.2d at 436. In *Gorenstein*, this court "suggest[ed] that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate," *id.*, but also "caution[ed]

them against the danger of setting prejudgment interest rates too low by neglecting the risk, often nontrivial, of default." *Id.* at 437.

Here, where no statutory interest rate applies, we see no reason to disturb the magistrate judge's decision to award prejudgment interest at a rate of 8.33%, for a total sum of $56,170.11, to the plaintiffs. (R. at 141.) As the magistrate judge noted, the defendants could have been charged with even more had the plaintiffs sought compounding interest, which the district court in its discretion could have awarded. *See Gorenstein*, 874 F.2d at 437 (listing cases).

## IV. CONCLUSION

We hold that the district court's decision to grant the plaintiffs' motion for summary judgment was proper, as was the district court's award of attorney's fees, costs, and prejudgment interest.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*