In re EDGEWATER MEDICAL CENTER, Debtor.

Edgewater Medical Center, Plaintiff,

v.

Peter Rogan, Braddock Management L.P., a California Limited Partnership, Bainbridge Management L.P., an Illinois Limited Partnership, Bainbridge Management, Inc., an Illinois Corporation, Defendants.

Bankruptcy No. 02 B 7378.
Adversary No. 04 A 2327.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 6, 2005.

Scott T. Mendeloff, Gabriel Aizenberg, Eric S. Pruitt, Shelly A. DeRouse, Sidley Austin Brown & Wood, for plaintiff.

Vincent J. Connelly, Phillip S. Reed, Debra L. Bogo–Ernst, Sean Dailey, Mayer, Brown, Rowe & Maw, for Defendants.

### *Memorandum Opinion*

BRUCE W. BLACK, Bankruptcy Judge.

The plaintiff in this adversary proceeding, Edgewater Medical Center ("EMC"), moves for summary judgement on three counts (breach of fiduciary duty, breach of contract, and indemnification) of its twelve count complaint against the defendants Braddock Management, L.P.("Braddock"), Bainbridge Management, L.P. ("Bainbridge L.P.") (Braddock and Bainbridge L.P. collectively, "the management compa-

nies"), and Bainbridge Management, Inc. ("Bainbridge Inc.").

## Jurisdiction

This court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1409(a).

## Parties

EMC, an Illinois not-for-profit corporation, operated a hospital located on the north side of Chicago. On February 25, 2002, EMC, by its custodian, filed for relief under chapter 11 of the United States Bankruptcy Code. Braddock was a California limited liability partnership that had management contracts with EMC beginning about August 1994 and continuing until about March 2000. Bainbridge L.P. was an Illinois limited liability partnership that had management contracts with Edgewater from about March 2000 until approximately May 2001. Bainbridge Inc., an Illinois corporation, has been the sole general partner of Bainbridge L.P. and has been sole general partner of Braddock since about October 1998. As such, Bainbridge Inc. had full, exclusive, and complete discretion in the management and control of the business and affairs of both Braddock and Bainbridge L.P.

## Facts

On January 15, 2003, at the direction of Bainbridge Inc., defendants Braddock and Bainbridge L.P. entered into plea agreements in which they agreed to plead guilty to felony charges that they had used EMC to operate a scheme to defraud Medicare. Medicare is a health care benefit program, as defined in 18 U.S.C. § 24. Medicare ordinarily authorizes payment for physician and hospital services only if those services are "medically necessary" to treat disease, disability, infirmity, or impairment. Medicare does not pay for services and treatment if a patient does not meet those criteria indicating medical need for services and treatment. Federal statute prohibits anyone from paying or receiving monies or otherwise providing or accepting a thing of value in exchange for patient referrals, when such payments are made knowingly and willingly. 42 U.S.C. § 1320a–7b. U.S. District Court Judge Susan B. Conlon accepted the resulting guilty pleas, and these two defendants stand convicted of the felony offense of health care fraud under 18 U.S.C. § 1347. The plaintiff relies primarily upon the plea agreements between the management companies and the United States Attorney for the facts supporting its motion for summary judgment, along with several exhibits consisting mostly of business records and various court documents. The facts contained therein are not in dispute and are summarized below.

Beginning in August 1994, Braddock entered into its first of three successive management agreements with EMC. In March 2000, Bainbridge L.P. succeeded Braddock in connection with the EMC management contracts. Thereafter, Bainbridge L.P. had much the same rights and responsibilities under the management contracts as had Braddock. The contracts provided that the management companies would act as the sole and exclusive manager of the day-to-day operations of EMC and that the management companies would supervise and manage all billings, collections, cost reporting, and other financial matters related to the operation of the hospital. The management companies agreed to perform their obligations as a fiduciary to EMC, agreed to perform all their obligations in accordance with all applicable laws, agreed to use best efforts and due diligence to comply with all applicable reg-

ulatory entities, and agreed to maintain good standing with all licensing and accrediting bodies. The management contracts included indemnification clauses requiring Braddock and Bainbridge L.P. to indemnify EMC for any losses as a result of false statement or breach of representation in the management agreements. In exchange for these promises, EMC agreed to pay management fees, both fixed fees and supplemental fees tied to EMC revenues. Additionally, the management companies' duties included negotiation and preparation of contracts, including physician agreements and those contracts necessary to obtain and maintain status as an approved Medicare Program provider.

Beginning prior to 1995 and continuing until at least the end of 2000, Roger Ehmen was an employee of Braddock and thereafter Bainbridge L.P. and was an agent of the management companies in connection with his activities at EMC. As such, Ehmen was one of the key administrators at EMC. Ehmen was known by various titles, including, by the end of his tenure, "Senior Vice President for Edgewater Hospital." Ehmen had significant responsibilities, which included recruiting doctors for EMC's staff, signing physicians' contracts, and maintaining and increasing the number of patients admitted to the hospital.

Roger Ehmen's employment agreement, entered into by Braddock and Ehmen as of January 1, 1997, made Ehmen responsible to Braddock, at that time the operating management company. Ehmen agreed to perform services on behalf of Braddock pursuant to the agreement Braddock had with EMC; to report to the president of Braddock; and to devote his entire time, attention, and energies to the business of Braddock. Ehmen served at the sole direction of Braddock, and the employment agreement provided that should Braddock terminate Ehmen's employment, Ehmen would then be required to resign any position he held with both EMC and Braddock.

From 1995 until the end of 2000, Ehmen and others devised and ran a scheme intended to defraud Medicare. The scheme operated by using the hospital to make illegal payments to certain physicians in exchange for patient referrals to the hospital. The illegal payments were concealed by the creation of contracts and other mechanisms designed to create the false impression that the payments were for legitimate services.

The management companies admitted guilt at the direction of their sole general partner, Bainbridge Inc. Bainbridge Inc. consented to a waiver of indictment and to the entry of Braddock and Bainbridge L.P.'s guilty pleas. James Streicker, on behalf Bainbridge Inc., signed both plea agreements.

In those pleas, the parties agreed that Ehmen, acting as the agent of the management companies, caused EMC to make payments to certain physicians in exchange for patient referrals. Braddock and Bainbridge L.P. admitted that, through their agent, they were aware of specific actions, including: that certain physicians were coaching patients to lie about their physical condition and their need for hospitalization; that these physicians were admitting patients to EMC who were not in need of hospitalization; that these physicians were creating false medical records to support their lies; that these records were then used to recommend and validate unnecessary tests, medical procedures, and treatments; and that these unnecessary medical services were then billed to Medicare. Ehmen, as an agent of Braddock and Bainbridge L.P., encouraged and assisted in these acts and caused them to happen. Ehmen caused the hospital to submit the false billing to

Medicare. The false billing was the result of unnecessary procedures performed on patients whose very presence in the hospital was the result of the illegal payments Ehmen orchestrated. As part of their guilty pleas, the management companies admitted that as a result of the scheme they caused Medicare to be fraudulently billed approximately $13,644,598.00.

As of November 1, 2001, Medicare notified EMC of its intention to suspended payment on all pending Medicare claims. EMC ceased its hospital operations on December 6, 2001. On December 21, 2001, a receiver was appointed pursuant to Illinois law. 735 ILCS 5/15–1704. On February 25, 2002, the Circuit Court of Cook County expanded the receiver's powers and appointed him custodian of EMC under a section of the Illinois Not for Profit Act. 850 ILCS 105/112.55(a)(2). That same day the custodian, on behalf of EMC, filed for relief under Chapter 11 of the United States Bankruptcy Code.

No discovery has occurred in this case. Braddock and Bainbridge L.P. have answered EMC's "First Amended Complaint." Shortly thereafter, the plaintiff filed this motion for partial summary judgment. The defendants sought and were granted additional time to file a memorandum of law in response. In their response, the defendants raised, for the first time, various affirmative defenses. After the plaintiff filed its reply, the defendants filed motions for leave to file both an amended answer and a surreply. Following a hearing, and after the parties had fully briefed the issues, the defendants' motions were denied.

### Discussion

The plaintiff moves for summary judgment on three counts of its twelve count complaint: breach of fiduciary duty, breach of contract, and indemnification.

The plaintiff alleges that the plea agreements along with various court records and business documents leave no genuine issue of material fact for this court to decide regarding the defendants' liability on these three counts. The plaintiff does not, however, seek to establish the amount of damages through this motion. It asserts only the fact of damages as necessary to establish the required elements of the causes of action. The plaintiff contends that the defendant Bainbridge Inc., as a matter of law, is jointly and severally liable for any recovery against the other two defendants, Braddock and Bainbridge L.P.

A summary judgment motion must be granted if there is no genuine issue as to any material fact. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 815 (7th Cir. 2002). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* All the facts and all reasonable inferences therefrom are to be drawn in favor of the nonmoving party. *Id.*

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a party must respond to a summary judgment motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir.2001). To defeat a motion for summary judgment, the opposing party must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Id.*

In their response, the defendants do not take issue with either the factual admissions in the plea agreements or with the other documents the plaintiff relies upon in

its motion for summary judgment. They do, however, take issue with the plaintiff's legal claim that these plea agreements may be validly asserted in this suit. Additionally, the defendants claim that this case presents "complicated questions of agency and attribution." Specifically, the defendants argue that certain agency relationships—between certain individuals involved in the Medicare fraud scheme and EMC—present legal issues that would deny the plaintiff a recovery. The defendants contend that whether these agency relationships exist is a genuine issue of material fact which may not be resolved by summary judgment. Further, the defendants deny that the plaintiff may use the criminal plea agreements for principles of collateral estoppel in this civil case.

Collateral estoppel is appropriate if: (1) the issue sought to be litigated is identical to one decided in a prior action; (2) that issue was actually litigated in the prior action; (3) the determination of the issue was essential to the final judgment in the prior action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the prior action. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir.1990). Collateral estoppel may be applied in civil trials to issues previously determined in a criminal conviction. "In this Circuit, a criminal conviction based upon a guilty plea conclusively establishes for purposes of a subsequent civil proceeding that the defendant engaged in the criminal act for which he was convicted." *Nathan v. Tenna Corp.*, 560 F.2d 761, 763 (7th Cir.1977). Federal law no longer requires mutuality for the "offensive" use of collateral estoppel; application of such estoppel is entirely within the "broad discretion" of the trial court. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The offensive use of criminal convictions by strangers to the original prosecution has been approved many times. *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir.1981).

In the instant case, the plaintiff argues that the plea agreements bind the defendants by collateral estoppel. The defendants argue that the issue in the criminal case differs from the issue to be decided here. The defendants' only argument on this point is that the issue in the earlier case is distinct from the issue here because in the earlier case the government established criminal liability, while in this case the plaintiff seeks to impose civil liability. The defendants' citations to authority for this proposition are not on point.[1]

---

1. The defendants cite to one case for this proposition in the body of their argument accompanied by additional citations in a footnote: *In re Grand Jury Proceedings of the Special April 2002 Grand Jury*, 347 F.3d 197, 202 (7th Cir.2003), (the court held that collateral estoppel did not prevent the government from seeking contempt for the defendant's refusal to testify at a grand jury proceeding following another court's finding five years earlier, regarding a separate grand jury proceeding, that imprisonment would not compel this defendant to testify because of his religious beliefs); *Whitley v. Seibel*, 613 F.2d 682, 685 (7th Cir.1980), (the court held that because of the incommensurate tests used to determine culpability, collateral estoppel did not prevent litigation in a civil action questioning the arrest and confinement of a defendant after an earlier criminal hearing established probable cause); *PaineWebber, Inc. v. Ras*, 767 F.Supp. 930, 934 (N.D.Ill.1991), (in this case the court determined that, indeed, *criminal convictions* did collaterally estop the defendants from denying three of five elements of *civil* fraudulent misrepresentation, the two elements not so estopped were not litigated at the criminal trial); *Carmel v. United States (In re Carmel)*, 134 B.R. 890 (Bankr. N.D.Ill.1991), (the court noted that the debtor defendant's criminal conviction for mail and wire fraud did not carry with it a determination of the intent necessary to collaterally

■ The defendants' arguments on this point most closely resemble an attack on the first prong of the above-mentioned test to determine the applicability of collateral estoppel: whether the issue presently sought to be precluded is identical to the issue decided in the prior action. In pertinent part, 18 U.S.C. § 1347 reads:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned. . .

Here, the plaintiff seeks to preclude the defendants from denying they knowingly and willfully executed a scheme to commit Medicare fraud. The defendants' pleas in the criminal case required an admission of guilt on the precise issue the plaintiff now seeks to preclude the defendants from denying. That issue was at the heart of the criminal convictions. Therefore, all of the elements of collateral estoppel are present and the defendants are collaterally estopped from denying their earlier pleas of guilt in the Medicare fraud scheme.

■ As a separate theory of liability, the plaintiff argues that the defendants are bound by all the factual admissions included in their pleas. *See New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (U.S.2001); *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C.Cir.

1980). The defendants are bound by the judicial admissions made in the criminal case. Moreover, the defendants do not deny the facts previously admitted in their pleas. For both of these reasons, all the facts in the defendants' guilty plea proceedings are taken as true.

■ The first count at issue in the motion for summary judgment alleges breach of fiduciary duty. A plaintiff alleging this cause of action must show: (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) an injury resulting from the breach. *Petri v. Gatlin*, 997 F.Supp. 956, 977 (N.D.Ill.1997).

■ In the management contracts, the defendants specifically agreed to assume a fiduciary obligation to the plaintiff. They do not now deny this relationship. A fiduciary duty is "[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person." Black's Law Dictionary 625 (7th ed.1999). The defendants' pleas establish the fact that the defendants used their position at EMC to operate a scheme both in violation of the law and against the interests of EMC. The defendants do not deny that they breached this duty. The fact of damages is established by, among other things, the Medicare fraud itself and the resulting Medicare suspension. Thus, the elements of this cause of action are established.

■ The second count at issue alleges breach of contract. "To establish a claim for breach of contract, a plaintiff must allege that a contract existed between it and the defendant, that the plaintiff substantially performed its obligation under the contract, that the defendant breached the contract, and that the plain-

---

estop the defendant from arguing that he did not have the intent necessary to establish civil

liability on tax evasion).

tiff was damaged by the breach." *Klem v. Mann,* 279 Ill.App.3d 735, 216 Ill.Dec. 454, 665 N.E.2d 514, 518 (1996). The defendants do not deny the existence of any of the elements necessary to establish the plaintiff's claim of breach. Nor do the defendants deny the factual allegations the plaintiff has asserted: that a contract existed; that the plaintiff substantially performed its obligations to the defendants; and that the defendants' guilty pleas establish that they breached their contractual obligations. Again, the fact of damages is established by, among other things, the Medicare fraud itself and the resulting Medicare suspension.

■ The plaintiff also seeks partial summary judgment regarding liability under the count for indemnification. The defendants do not dispute that the management contracts provide for instances in which the management companies shall indemnify EMC. The management contracts require that the defendants hold harmless and indemnify EMC for damages resulting from the management companies' direct or indirect breach of any agreements or any false representations. The management agreements also require that the management companies perform all their responsibilities in compliance with all laws, and that they use their best efforts to ensure that EMC maintains its good standing with all regulating agencies. By committing Medicare fraud, the defendants have breached their agreements under the management contracts, and the plaintiff has established the requirements for indemnification.

The defendants have not seriously tried to deny the existence of the elements of the three causes of action implicated by the motion for summary judgment. Instead, as their primary argument against the motion, the defendants assert three affirmative defenses: dual agency, *in pari delicto,* and ratification. The defendants raised these defenses for the first time in their brief in response to this motion for summary judgment.

■ Federal Rule of Civil Procedure 8(c) addresses the need to plead affirmative defenses. Rule 8(c) lists several affirmative defenses: accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, and waiver. Rule 8(c)'s list is not exhaustive. *See* Fed. R.Civ.P. 8(c) (a party must plead "any other matter constituting an avoidance or affirmative defense"); *Native Am. Arts, Inc. v. Waldron Corp.,* 253 F.Supp.2d 1041, 1045 (N.D.Ill.2003). By their nature, affirmative defenses require the defendants to bear the burden of proof on those particular issues. *Id.* Another way to look at it is that affirmative defenses are reasons why defendants are not liable even if they admit the facts alleged in the complaint. *Id.* Defendants bear the burden of proof on their affirmative defenses. *Id.*

■ Although the defendants, in their brief, do not label these three topics as "affirmative defenses," each of the three sections in the defendants' brief addressing these topics acknowledges the management companies' culpability in the Medicare fraud scheme and only argues that EMC should also bear some measure of responsibility. In this case, I conclude that dual agency, *in pari delicto,* and ratification are all affirmative defenses for purposes of Rule 8(c). Therefore, the defendants must both properly plead these defenses and must bear the burden of proof on the defenses in this summary judgment proceeding.

■ The plaintiff argues that by failing to properly raise these affirmative defenses in their answer, the defendants have waived the defenses now asserted in response to summary judgment.[2] Although the defendants failed to raise any of their three affirmative defenses before the plaintiff's motion for summary judgment, such failure to raise affirmative defenses by responsive pleading does not always result in waiver where, as here, failure did not result in surprise or unfair prejudice to the plaintiff. *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir.1997). Because the plaintiff has been able to fully brief all the issues the defendants now present, no prejudice is apparent to the court.

■ For their first affirmative defense, the defendants' claim that Ehmen acted as a "dual agent," responsible in his actions both to the management companies and EMC. The defendants acknowledge that, "[i]n their guilty pleas, the [m]anagement [c]ompanies have accepted responsibility for the acts of Roger Ehmen." But, the defendants argue, "[EMC] should also bear responsibility for Ehmen's acts." The defendants contend that Ehmen's responsibilities ran to EMC in addition to the management companies, and therefore Ehmen was a "dual agent" of both EMC and the management companies.

For their second affirmative defense, the defendants contend that, "Ehmen had several co-conspirators... all of whom were [EMC] agents." They cite case law for the proposition that, *"in pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim." *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 574

(7th Cir.2004). Again admitting their own culpability, the defendants' argue that a question of fact exists whether certain physicians involved in the Medicare fraud scheme were agents exclusively for EMC, and that, if so, because of these physicians' involvement in the scheme, EMC now brings suit with unclean hands.

Lastly, regarding their third affirmative defense, ratification, the defendants argue that there is a question of fact whether EMC approved of and benefitted from the wrongful conduct that is the subject matter of this suit. The defendants argue that some of the proceeds of the Medicare fraud went to EMC and further that EMC may have renewed the management companies' contract after EMC had learned of the government's investigation into the Medicare fraud scheme. The defendants claim that these are facts in dispute, and they argue that if they are proved at trial the court should then accept the defendants' argument that EMC ratified the wrongful conduct at the heart of this suit.

In each of their three affirmative defense arguments, the defendants allege that facts are in dispute, which require denial of the motion for summary judgment. As explained below, I conclude as a matter of law that these affirmative defenses are inapplicable to the facts of this case. It follows that the alleged questions of fact are not material and do not constitute a defense to this motion for summary judgment.

■ The filing of the bankruptcy petition instantly alters the rights of a corporation. *Delgado Oil Co. v. Torres*, 785 F.2d 857, 860 (10th Cir.1986). The Chapter 11 debtor, as debtor in possession,

---

**2.** In their answer, the defendants do include a section under the heading "Affirmative Defenses." This section is two sentences long, names several affirmative defenses, not including the defenses now asserted, and claims to reserve the defendants' rights to assert additional affirmative defenses as they become known through discovery and to then amend their answer.

is endowed with the powers of a trustee. *Id.*

Section 323(b) of the Bankruptcy Code gives the trustee the right to prosecute causes of action belonging to the estate.... Such actions fall into two categories: those brought by the trustee as successor to the debtor's interest in the estate; and those brought under the trustee's avoiding powers.... Under the first group, the trustee stands in shoes of the debtor and may only institute whatever actions the debtor could have brought itself and is subject to same defenses as could have been asserted by the defendant had action been brought by the debtor.... It is only when the trustee is exercising his avoiding powers that he accedes to a superior status and possesses extraordinary rights. *Barber v. First Nat'l Bank* (*In re Ostrom–Martin, Inc.*), 188 B.R. 245, 251 (Bankr. C.D.Ill.1995) (internal citations omitted).

The present case is not brought under the avoiding powers of the debtor in possession, but rather by the debtor's successor interest to its pre-petition claims. Therefore, the issue in this case becomes: to which defenses would the pre-petition debtor have been subject.

 Section 541 of the Bankruptcy Code is the general provision addressing property of the bankruptcy estate. "The most significant limitation in determining the scope of property of the estate is one of timing. Under section 541(a), and with few enumerated exceptions, the bankruptcy estate consists of all of the debtor's legal and equitable property interests that existed as *of the commencement of the case,* that is, as of the time that the bankruptcy petition is filed." 5 Collier on Bankruptcy, ¶ 541.02, p. 541–8 (15th ed. Revised, 2004), (emphases in original). In the instant case, on December 21, 2001, the Circuit Court of Cook County appointed a receiver. On February 25, 2002, that

same court expanded the receiver's powers to that of custodian. Later that same day the custodian filed this bankruptcy petition. Therefore, in this case, the plaintiff is subject to the same defenses as the custodian for EMC would have been at the time of filing the petition.

 The appointment of a receiver alters the defenses to which a corporation is subject by removing the wrongdoer from the scene for purposes of *in pari delicto. Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir.1995). In *Scholes,* a receiver, appointed to collect assets on behalf of a corporation that engineered a Ponzi scheme, sought to recover assets from a few investors who were paid money in the early stages of the scheme. The receiver sued under Illinois fraudulent conveyance laws. The initial question the court considered was whether the suit was properly brought by the receiver. It could be argued that the corporation responsible for the Ponzi scheme had not been harmed as a result of the scheme, and that the receiver for the corporation should not be able to recover payments made by the corporation in furtherance of the scheme.

The court held that the corporation had been used for a wrongful purpose by its principal and that had the receiver not been appointed, the fraudulent actors, including the corporation, would have been denied recovery because of the fraudulent acts. *Id.* The court noted that once the corporation had been freed of the previous director's control, the corporation was no longer an "evil zombie." *Id.* The court found that the appointment of a receiver freed the corporation from the wrongdoer, entitling the return of moneys for the benefit of innocent investors. "[T]he defense of *in pari delicto* loses its sting when the person who is in *in pari delicto* is removed." *Id.*

 In this case, too, the wrongful actors have been removed, first by the

appointment of a receiver, next by that receiver's subsequent appointment to the more expansive role of custodian. The defendants ask this court of equity to deny the plaintiff's motion for summary judgment in order to hear evidence on pre-petition wrongdoing by the debtor in possession arguing that the plaintiff's complicity in the wrongdoing should prevent its recovery from other wrongdoers. Nevertheless, the *in pari delicto* defense exists only because wrongdoers must not be permitted to profit from their wrongdoing. The affirmative defenses of "dual agency" and ratification both share this rationale in that they require a defendant, after an initial admission of culpability, to present evidence of shared wrongdoing by the opposing party. As in *Scholes*, the appointment of the receiver and the removal of the perpetrator of the wrongdoing eliminates the possibility of rewarding the wrongdoer. Thus, the policy arguments supporting these affirmative defenses no longer exist.

All three defenses are inapplicable to this case for the same reason: the debtor in possession is not subject to these equitable defenses because the receiver and the custodian who filed the bankruptcy on behalf of EMC would not have been subject to these equitable defenses. Although *Scholes* concerned an Illinois fraudulent transfer action, and the instant case concerns actions in tort and contract, for present purposes, this is a distinction without a difference. The policy undergirding *Scholes* is applicable here: where a receiver has been appointed to maximize value only for the benefit of creditors, the rationales for these equitable defenses lose their meaning.

Thus, no evidence regarding any pre-petition wrongful actions is material. When the EMC custodian filed this bankruptcy, the custodian-controlled corpora-tion became the debtor in possession and stepped into the shoes of EMC. This plaintiff is now at least two levels removed from any wrongful actors who engaged in the Medicare fraud. In this suit, the debtor in possession is engaged in the collection of assets for distribution to creditors, not for its own benefit. Given that EMC was organized as a not-for-profit hospital, it seems unlikely that any potential creditors could be parties who were engaged in the Medicare fraud scheme. Nevertheless, should this be the case, the very equitable defenses asserted in this case and the equitable subordination of this category of creditors' claims serve to ensure that these wrongful actors will not recover from the estate.

Lastly, the plaintiff contends that, as a matter of law, Bainbridge Inc. is liable to the same extent as are Bainbridge L.P. and Braddock. Because Bainbridge L.P. is an Illinois limited partnership and Braddock is a California limited partnership, both California and Illinois law must be considered. The defendants only response to this assertion is found in a footnote, which asserts that any consideration of this argument is premature as the plaintiff is not entitled to summary judgment in the first place.

▆▆▆▆ Both states have adopted the Uniform Limited Partnership Act, which provides that, "a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners." (805 ILCS § 210/403(b); Cal Corp Code § 15643(b)). Additionally, both states have adopted the Uniform Partnership Act, which holds partners in a general partnership jointly and severally liable for the debts and obligations of the partnership. *See In re Keck, Mahin & Cate*, 241 B.R. 583, 594 (Bankr.N.D.Ill.1999); *see also City of San Diego v. DeLeeuw*, 12 Cal.App.4th 10, 13, 15 Cal.Rptr.2d 98, 99 (Cal.App.1993). Both states hold general

partners liable to creditors for the debts of the limited partnerships. *See Allen v. Amber Manor Apartments Partnership,* 95 Ill.App.3d 541, 547, 51 Ill.Dec. 26, 420 N.E.2d 440, 445 (Ill.App.1981); *see also Kazanjian v. Rancho Estates, Ltd.,* 235 Cal.App.3d 1621, 1 Cal.Rptr.2d 534 (Cal. App.1991). Therefore, Bainbridge Inc., as general partner of both Bainbridge L.P. and Braddock, is fully liable to EMC as a matter of law.

### Conclusion

For the reasons discussed herein, no genuine issue of material fact is in dispute; and partial summary judgment on the question of liability is GRANTED in favor of the plaintiff for breach of fiduciary duty, breach of contract, and indemnification, with the only remaining issue on these three counts being the amount of damages. This Memorandum Opinion will serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. A separate judgment will be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.